UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>       Plaintiff,<br><br>       v.<br><br>BAKERSFIELD CITY SCHOOL DISTRICT AND SCHOOL BOARD OF BAKERSFIELD CITY SCHOOL DISTRICT; HERBERT M. COLE JR., Superintendent,<br><br>       Defendants. | 1:84-cv-00039 OWW JLT<br><br>MEMORANDUM DECISION AND ORDER RE JOINT REQUEST TO DECLARE UNITARY STATUS, TERMINATE CONSENT DECREE, AND DISMISS CASE (DOC. 21) |

## I. INTRODUCTION

Before the Court for decision is a joint motion filed by all parties to (1) declare that a "unitary school system" now exists in Defendant Bakersfield City School District ("District"); (2) terminate the Consent Decree entered in this case on January 25, 1984 ("Consent Decree" or "Decree") and thereafter modified from time to time; and (3) dismiss this case. The matter came on for hearing on January 10, 2011 at 10:00 a.m. in Courtroom 3 (OWW). No objections have been received by the Court.

## II. BACKGROUND

In the early 1970s, the Office of Civil Rights of what was then the U.S. Department of Health Education and Welfare, subsequently the Department of Education

("DOE"), conducted an investigation of civil rights violations allegedly perpetrated by Defendant Bakersfield City School District ("District").  At issue were the District's practices in the areas of bilingual education, the treatment of educable mentally handicapped students, and student assignment.  The DOE investigation ultimately led to a compliance proceeding before an Administrative Law Judge ("ALJ").  On January 12, 1978, the ALJ found the District in violation of the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964 in all three areas of DOE concern.  The District was deemed ineligible for federal financial assistance until it made corrections.

While the District was pursuing appellate remedies, significant changes occurred within the District.  A new governing board was elected, a new superintended was hired, administrators were changed, new legal counsel was appointed, and substantial changes in state law resulted in changes to the District's programs in the areas of concern.  The District was subsequently able to resolve its differences with DOE on two of the issues of concern: bilingual education and its programs for educable mentally handicapped students.

However, the parties were unable to reach full

agreement on the issue of student assignment.  Although some progress had been made in the District to encourage greater racial and ethnic diversity, there remained a handful of schools whose enrollment was almost entirely minority, and a few schools whose enrollment was largely white, in a district then roughly balanced between minority and white.  DOE wanted further changes to address these issues, but the District was unable to accommodate these requests.  DOE agreed not to terminate federal financial assistance as a result of the student assignment issues, but indicated the matter might be forwarded to the Department of Justice ("DOJ") for further review.

After continued negotiations failed, the matter was referred to DOJ.  On November 29, 1982, DOJ requested information about what progress had been made in implementing integration measures voluntarily adopted by the District.  Information was provided to DOJ, and extended negotiations between DOJ and the District ensued.  These negotiations culminated in the filing on January 25, 1984 of this action and the immediate entry of a consent decree.

The Complaint alleged that some elementary schools continued to have student enrollment levels which

3

remained substantially all-minority as a result of the District's failure to take adequate corrective steps, although educationally sound and administratively feasible alternative methods of student assignment were available, including plans already considered by the District.  The Decree focused directly on student assignment and on programs deemed necessary to reduce segregation.  It mandated that the District:

- continue to maintain an administrative office whose mission was to assist in developing and implementing integration programs;
- continue and if possible expand its controlled open enrollment program ("COE") to encourage students at schools with predominantly white enrollments to attend predominantly minority schools, and vice versa, with particular emphasis on encouraging students at "racially imbalanced schools" (defined in the Decree as Fremont, McKinley, Mt. Vernon and Owens elementary schools) to attend Nichols or Eissler schools, both then predominantly white;
- continue to recognize "reduction of racial isolation" as a grounds for permitting student transfers on a year by year basis under the District's interschool transfer policy;

4

- continue its short term mini magnet programs whereby students from diverse ethnic and racial backgrounds came together for programs designed to provide concentrated, short term enrichment experiences, enhance academic achievement and increase social awareness and racial tolerance; each of the then 25 District schools to continue to offer one or more such programs every year, at least until full term magnet programs were operational;
- establish full term magnet programs at the Fremont and Mt. Vernon schools, two of the "racially imbalanced schools" in the next school year, 1984-85, to attract white students to attend those almost entirely all-minority schools; and establish full term magnet programs at the other two "racially imbalanced schools," McKinley and Owens, the following year, 1985-86.

The full term magnet school programs were to be the core of the District's desegregation effort. Several years later the same concept was extended to Juliet Thorner and Cesar Chavez schools, to encourage minority students to attend new schools, which, based on the demographics of their attendance areas, might otherwise have disproportionately white enrollments.

5

In addition to these programs aimed at altering student assignment patterns at specific schools, the Decree required the District to provide compensatory education at the four racially imbalanced schools as well as certain other predominantly minority enrollment schools.  The District was also authorized to develop other plans, programs and policies to afford greater choice in student enrollment and to promote further desegregation through voluntary means.  The District was ordered to ensure that, consistent with educational values and the proper operation of the school system as a whole, school closings, site selection and new construction, and adjustments of contiguous attendance boundaries and feeder patterns should further desegregation.

The Decree was subsequently modified by consent Orders entered September 9, 1986 ("1986 Order") and June 30, 1990 ("1990 Order").  The 1986 Order addressed concerns about the District's bilingual education programs sometimes conflicting with efforts to reduce racial and ethnic isolation, provided for enrichment programs to be established at certain schools where the lack thereof was a potential deterrent to minority students participating in the Controlled Open Enrollment

program ("COE"), called for additional counselors to be provided at the magnet schools to encourage greater participation in and reduce drop out from the magnet programs, and required preparation of a comprehensive facilities utilization study to plan for anticipated new facilities in the District.

The 1990 Order required that the "pull out" gifted and talented program be moved to Owens, one of the "racially imbalanced schools," so that students in those programs attend Owens once a week, and that additional counselors be provided in magnet and COE schools to serve increased enrollment.  The 1990 Order also approved construction of new elementary and middle schools, and provided for desegregation programs, including magnet programs, to be implemented at some of those schools.

In 1990-91, a full-time magnet program was initiated at Juliet Thorner School, similar in concept to the magnet programs already in place at the "racially imbalanced schools," but intended to draw Hispanic and African-American students to a new school in an attendance area with a relatively high percentage of white students as compared with the District-wide average.  In 1994-95, another full-time magnet program was initiated at Cesar Chavez School, again to encourage

7

Hispanic and African-American students to attend a new school in an attendance area expected to have a larger percentage of white students as compared with the District-wide average.  Those magnet programs remain in operation today.

Section XI of the Decree permitted the District to move for a declaration of unitary status and termination of the case as early as the conclusion of the 1986-87 school year.  The Court was to grant such a motion without a hearing if the racial (and ethnic) enrollment at the four schools previously identified as "racially imbalanced" were within +/- 20% of the District-wide racial enrollment.  If these percentages were not achieved by that deadline, a hearing would be required in which the District would have to demonstrate that "it has fully and in good faith taken the appropriate steps to ensure full and proper implementation of the plans, programs, and policies provided in this Decree."  Consent Decree at 11.

> If the District can demonstrate that it has implemented the plans, programs, and policies approved by this Court and continued them in effect through the 1986-87 school year, a declaration of unitariness shall be entered, the Consent Decree terminated and this case dismissed.  Otherwise, this Court shall retain jurisdiction until the District has demonstrated that it has implemented the plans, programs, and policies approved by this Court and continued

8

```
                    them in effect for three consecutive school
                    years at which time the declaration shall be
                    entered, the Consent Decree terminated and this
                    case dismissed.
```

*Id.*

The District did not meet the target of +/- 20% of systemwide racial enrollment percentages by the 1986-87 school year, and did not move for dismissal at that time. The District met the +/- 20% target as of the 1992-93 school year, and has satisfied that target ever since, but has never previously moved for a declaration of unitary status and dismissal.

The District has experienced significant demographic shifts since the Decree was entered in 1984.  In 1984, District enrollment was 35% Hispanic, 16% African-American, and 47% white; in the 2009-10 school year the District was 75% Hispanic, 10% African-American, and 10% white. The District's enrollment is also much larger than it was in 1984; total enrollment for the 1983-84 school year was 18,506, while total enrollment for the 2009-10 school year was 27,267.  The District operated 32 schools in the 1983-84 school year; in 2009-10 it operated 41 schools.

On February 19, 2010, the District was ordered to prepare a Final Report of its implementation of the plans, programs and policies called for by the Decree,

including but not limited to the information required by Section IX of the Decree, such additional information as the United States may reasonably request for purposes of its review, and an appropriate affirmation by the District of its intention to continued to operate in full compliance with law.  The United States was directed to review the District's performance as it deemed necessary; within 90 days of receiving the Final Report and information or in any event by September 28, 2010 to inform the District of its assessment of the District's compliance; and confer and attempt to present a joint motion to the Court to address concerns raised by the United States or to seek unitary status if the United States determines that in its opinion the District has complied with its desegregation obligations and federal law.

On June 28, 2010 the District filed and served on the United States a Final Report of the Bakersfield City School District which included annual reports of the racial/ethnic distribution of enrollment at each of its schools for the years 1983-84 through 2009-10, financial information regarding revenues and the costs of operating desegregation programs and supporting infrastructure, biannual enrollment figures from 1983-84 through 2009-10

10

for Hispanic, African American and white enrollment at each of the District's schools, biannual percentages of White and minority enrollment at each of the magnet and COE schools from 1983-84 through 2009-10, and a description of the District's efforts to implement the plans, programs and policies required by the Decree over the twenty six year period since the Decree was entered. Doc. 14.

The Final Report confirmed that since 1992-93 the racial/ethnic enrollment at the previously identified "racially imbalanced schools" has been within +/- 20% of the systemwide percentages.  See *id*. at 11.  As of the 2009-10 school year, every school in the District except the Downtown School has a white/African-American/Hispanic enrollment ratio within +/- 20% of the system wide distribution, mostly within +/- 10% thereof, and at the "racially imbalanced schools" identified in the Decree the ratio is within +/- 6% of the system wide distribution.  *Id*.  The District has represented that it has fully and in good faith implemented the plans, programs and policies called for by the Decree and the modifying Orders, and that it has been operating, is now operating and intends to continue to operate a system which complies in all respects with the requirements of

11

Title the Federal Constitution.  *Id*. at 63-64.

The Parties' Joint Motion represents that, upon receipt of the Final Report, the United States conducted a review of the District's performance.  On the basis of its review of the information provided in the Final Report and additional materials and information subsequently provided, the United States has concluded that the District has since 1992-93 met the 20% +/- systemwide racial/ethnic goals at the previously identified "racially imbalanced schools"; that presently every school in the District except the Downtown School meets the +/- 20% goal, and most are within +/- 10% or less of the systemwide enrollment ratios; that the District has complied and is complying with the plans, programs and policies called for by the Decree; and that the District is operating in a unitary manner.  *See* Doc. 21 at ¶ 16.

### III. DISCUSSION

A Consent Decree can exist only as long as it is needed to remedy the original constitutional violations that justified its adoption.  *See Freeman v. Pitts*, 503 U.S. 467, 489 (1992) ("A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation."); *id*.

12

at 496 ("The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the de jure violation being remedied."). The Supreme Court has held that the party moving to terminate a desegregation consent decree must demonstrate good-faith compliance with the Consent Decree since it was entered, and that the vestiges of past discrimination have been eliminated to the extent practicable. *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 249-50 (1991).

The Consent Decree embodies these standards by requiring the District to demonstrate that "it has fully and in good faith taken the appropriate steps to ensure full and proper implementation of the plans, programs, and policies provided in this Decree." Consent Decree at 11.  The Final Report described above demonstrates good faith compliance with the Decree as well as substantive accomplishment of the +/- 20% goal at all but the Downtown School.  The United States is satisfied with the District's past and continued efforts.  The performance conditions of the Decree have been met.  A declaration of unitary status, termination of the Consent Decree, and dismissal of this case are justified.

13

## IV. CONCLUSION

For the reasons set forth above:

(1) It is DECLARED that Defendant Bakersfield City School District has achieved unitary status;

(2) The 1984 Consent Decree, as subsequently modified by the 1986 and 1990 Orders, is TERMINATED; and

(3) This case is DISMISSED WITH PREJUDICE.

SO ORDERED
Dated:  January 11, 2011

                                            /s/ Oliver W. Wanger
                                               Oliver W. Wanger
                                     United States District Judge